UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

BRENDA ZANNY,

      Plaintiff,

v.

KELLOGG COMPANY and
METROPOLITAN LIFE
INSURANCE CO.,

      Defendants.
_____/

Case No. 4:05-CV-74

Hon. Richard Alan Enslen

**OPINION**

Metropolitan Life Insurance Company has arrived at a formula for operating a profitable insurance business. It simply does not allow piddling things like facts to intrude upon its employee benefit claims decisions. Witness *Zanny v. Kellogg Company and Metropolitan Life Insurance Co.*

**INTRODUCTION**

This matter is before the Court to review the administrative decision of Defendant Metropolitan Life Insurance Company denying continued long-term disability benefits to Plaintiff Brenda Zanny. For the reasons which follow, the Court determines that the administrative decision was made in error and this matter should be remanded to the benefits administrator for an award of long-term disability benefits.

**FACTUAL BACKGROUND**

Plaintiff was actively employed by Defendant Kellogg Company between 1991 and February 23, 1998 (the date on which she commenced long-term disability leave). (Administrative Record ("A.R.") 203-04, 612.) Her position at the time leave commenced was an Associate Director. (*Id.*)

Kellogg Company offered employees, including Plaintiff, various employee benefits, the administration of which are subject to review under section 502 of the Employee Retirement and Income Security Act of 1974, 29 U.S.C. § 1132. These benefits included a long-term disability plan, which was administered by Metropolitan Life Insurance Company ("MetLife"). MetLife was also the insurer of supplemental long-term disability plan benefits–those benefits which are implicated by disability continuing for more than five years from the onset of disability.[1]  (*See* A.R. 24.)

Plaintiff's right to disability benefits is summarized in the summary plan document's definition of "total disability." That term has two separate definitions, one for the first 36 months from the onset of disability, and another applicable after the first 36 months of disability:

> During the first 36 months of your disability, which includes your Qualifying Disability Period,[2] you must be unable to perform all the normal duties of your regular occupation for any employer and you must at no time engage in any occupation or employment for pay of profit. This must be due to your disability. The Company will decide if this is the case.
>
> After the first 36 months of disability, you must be completely unable to engage in any occupation or employment for which you are or become qualified. You could be qualified because of your education, training, or experience.

---

[1] In some of the correspondence, a MetLife representative referred to their insurance policy language as opposed to the controlling plan language. The policy language (in terms of the five year elimination period) is effective in defining when MetLife becomes the responsible payor, but does not effectively alter the definition of disability under the plan language or the manner in which disability is to be determined by the plan administrator. MetLife has not argued to the contrary (*see* MetLife Resp., 1, 7 & n.5), nor could it since the employee lacked effective ERISA notice of an amendment of those plan terms. Even assuming, however, that the MetLife terms replaced the plan definitions after 60 months of disability, this would not alter the Court's conclusion of disability since Plaintiff was "totally disabled" under all the pertinent definitions, and even were the Court to apply the "arbitrary and capricious standard" set forth in the MetLife policy.

[2] The Qualifying Disability Period is 12 continuous months of disability. (A.R. 6.) There is no dispute on this record that Plaintiff met this requirement.

>An individual will not be considered totally disabled if engaged in any suitable employment (other than company sponsored rehabilitative employment).

(A.R. 6.)  The plan language was amended in 1997 to lift a $4,000 monthly cap on the payment of benefits, though such amendment did not alter the controlling definition of "total disability" under the controlling plan language.  (*See* A.R. 37-40.)

Because the controlling plan language did not assign discretionary authority to determine the entitlement of benefits to the plan administrator, the parties have stipulated that plan review is to be conducted *de novo* based upon the administrative record.  (Jan. 15, 2006 Stip. ¶ 2.)

Beginning in February 1998, Plaintiff suffered multiple psychiatric hospitalizations associated with multiple suicide attempts (medication overdoses), self-mutilation, severe depression, borderline personality disorder, dissociative identity disorder, eating disorders, and dyslexia. Plaintiff's psychiatric problems are not of recent origin and her history includes sexual abuse as a child, adolescent and young adult.  During such hospitalizations, Plaintiff was scored with Global Assessment of Functioning ("G.A.F.") scores well below 50.

Plaintiff applied for disability benefits and MetLife determined by letter of September 14, 1999 that she qualified for those benefits effective February 23, 1998. (A.R. 612.)  At the same time, MetLife required her to apply for social security benefits.  (*Id.*)  Plaintiff was later approved for social security disability benefits (which reduced the disability payments) on or about July 19, 1999. (*See* A.R. 51, 614.)   The social security determination was made after the examination of Psychologist Linda Stuppy, Ph.D. on May 24, 1999.  (*See* A.R. 627.)  Ms. Stuppy found a history of multiple psychological hospitalizations and suicide attempts.  (A.R. 622.)  Past diagnoses included: "Major Depressive Disorder, Dissociative Disorder, possible Bipolar Disorder, possible

3

Eating Disorder, and Histrionic and Borderline Personality Traits." (*Id.*)  She noted a current and past history of pharmacological treatment for these diagnoses. (*Id.*)  She noted severe deficits of social functioning related to both remittent hallucinations and "17 alter[ed] personality states." (*Id.* at 623.)  Ms. Stuppy gave diagnoses for "Dissociative Disorder-NOS [not otherwise specified], Major Depressive Disorder–Recurrent–in Partial Remission, Eating Disorder–NOS, and Anxiety Disorder." (*Id.*)  These diagnoses resulted in a G.A.F. score of 48. (*Id.*)  Plaintiff's "[p]rognosis for complete recovery from Axis I diagnoses appear[ed] guarded for the short-term.  It [was] expected with continued medication and outpatient treatment symptoms may stabilize enough to enable . . . non-stressful work." (*Id.*)

Plaintiff's MetLife file indicates a continual interest on the part of MetLife to reassess the file to redetermine disability status.[3]  During one such file review, psychologist Jay A. Lasser, M.D. reviewed over 2,000 pages of medical records, documents and diary entries.[4]  His report of July 22, 1999 concluded that "it seems quite clear that ee's sx would preclude her from a rtw at this time .

---

[3]The proclivity of doctors and claims personnel to use shorthand requires the following glossary, which explains the Court's understanding of such shorthand: "dx"–diagnosis; "ee"–employee; "ime"–independent medical examination; "pt"–patient; "rtw"–return to work; and "sx"–symptom(s).

[4]The parties have filed three Administrative Records–the A.R., the First Supplemental A.R., and the Second Supplemental A.R.  The A.R. itself is only 677 pages.  This means that Dr. Lasser and others, including Dr. Gosline (who has indicated review of a more massive record, including the history of psychiatric hospitalizations and the therapist records) have reviewed the larger record in reaching their conclusions.  The larger record is helpful in that it provides valuable data about physician visits, hospitalizations, suicide attempts, objective testing, treatment strategies and medications.  As such, the Court construes the administrative record *per se* as including the A. R., the First Supplemental A.R. and Second Supplemental A.R.  The Court does note, however, that even were it to confine its considerations to the A.R. documents alone, it would not alter its conclusions since continued disability is evident even on the smaller record alone and even applying the stricter "arbitrary and capricious" standard.

. . . I also think it is safe to assume that the dxes given are correct ." (A.R. 616.) Dr. Lasser closed with the following warning:

> . . . I reiterate that the pt does still seem severely impaired up to this point in time; and would give a "heads up" to anyone involved in this case that people with these dx's, while quite fragile and primitive at time (as this pt certainly is), can on another level be quite intelligent, and can appear quite "gamey" and manipulative due to their intense need to feel in control of situations, particularly ones involving authority figures, and you are the ones, after all, controlling her "allowance."

(*Id.*)

MetLife later sent determinations to Plaintiff dated December 27, 2000 and February 23, 2001 informing Plaintiff that she was approved for continued disability payments. (A.R. 499 & 491.) The first such determination incorrectly referenced the MetLife policy language as opposed to Kellogg Company's plan language. (*Id.*) The second letter, though, did not reference the inapposite language and was timed to roughly coincide with the 36-month commencement of long-term disability benefits under the plan language. (*Id.*) Both letters indicated that the determination was subject to periodic medical review. (*Id.*)

MetLife's computer record (which is referred to as its "diary") referenced the later approval and noted Plaintiff's history of dissociative disorder, major depression, suicide attempts and "volunteer" office work for Plaintiff's therapist. (A.R. 78.) Disability benefits were approved in part because "attention span is sporadic, she decompensates easily when stressed or pressured. IME concluded that she is disabled and unable to work for any authority figure. . . ." (*Id.*) The independent medical examination report referenced was prepared by Psychiatrist Kenneth Silk, M.D. on December 28, 2000 after a December 18, 2000 examination of Plaintiff. (A.R. 426-28.)

Dr. Silk's findings were consistent with continued inability to work due to depression and dissociative identity disorder. (A.R. 427.) Dr. Silk was asked whether Plaintiff would be able to manage and work as a full-time business proprietor. He concluded that "Ms. Zanny will have a difficult time handling financial and corporate affairs . . . and can do productive work only a very few hours a day." (A.R. 427.) He further expressed concern that residential treatment of eating disorder patients would be a particularly difficult business venture because insurance reimbursement for such service was "inconsistent at best and downright fickle most of the time . . [including the area of] residential treatment . . ." (A.R. 428.) Dr. Silk also opined that Plaintiff could not work a technical job due to inability to perform duties for a supervisor. (*Id.*) Finally, Dr. Silk expressed his impression that Zanny's sessions with her therapist may have been ineffectual and implied that "cognitive-behavior approaches designed to develop and build certain copying strategies . . ." would be more effectual. (*Id.*)

As noted, Plaintiff was at the time of the 36-month determination performing volunteer work for a company operated by her therapist (Kathryn Taylor) named Sparrows' Haven (a for-profit company offering treatment for eating disorders). This work was explained in Brenda Zanny's October 31, 1999 letter (which itself was delayed because Plaintiff was "having more bad days than usual lately.") (A.R. 596.) The letter noted that Plaintiff was working on attaining a business schedule but often would get "'stuck' and afraid, which means that sometime I miss my goal by 1 or 2 hours." (*Id.*) "Because I was unable to follow a schedule, show up on time, and have expectations placed on me, *etc.*, I couldn't find anyone willing to take me, even as a volunteer." (A.R. 598.) For this reason, Plaintiff began doing secretarial/administrative work for her therapist

as part of the Sparrows' Haven venture. She reported that she worked 15 hours a week as of her October 31, 1999 letter.[5] (*Id.*)

Other significant events in this medical history include two motor vehicle crashes–one on March 25, 2001 and the second on May 10, 2001. According to the report of Psychologist Alan Lewandowski of April 24, 2001, Plaintiff was involved in a single-car accident on March 25, 2001 in which her car slid on ice into a guard rail. She continued on from the car accident to her church where church members directed her to get medical attention. (A.R. 479.) She then received subsequent medical treatment at Borgess Immediate Medical Care at Woodbridge Hills and Borgess Medical Center. (A.R. 484, 489.) The treating physicians were concerned about possible closed head injury and aggravation of her pre-existing psychological problems. Mr. Lewandowski noted the history of psychological illness, including self-inflicted wounds, and gave a general clinical impression: "Closed head injury/concussion vs. dissociative disorder vs. recurrent mood disorder

---

[5]This letter (though it contains some elements of self-aggrandizement, including as to the number of hours worked) is also generally consistent with MetLife's Surveillance Report which showed scattered attendance by Plaintiff at her therapist's offices. The Surveillance Report was commissioned by a Mr. Kooi of MetLife. (A.R. 430.) Such reports are useful in certain contexts in which physical disability is disputed. *See, e.g., Ferragamo v. Chubb Life Ins. Co. of Am.*, 94 F.3d 26, 27 (1st Cir. 1996). The Report here is not useful for a variety of reasons. Its authors' identities and backgrounds are not given. (A.R. 430-36.) The hearsay sources used by the authors are in some cases identified as "unknown" ones whose "reliability was not known." (A.R. 432.) Aside from that, the Report did little more than to document that Plaintiff visited fast food establishments and her therapist's office. What is most shocking about the Report is the underlying context. In this instance, Mr. Kooi made the object of videotaped surveillance and spying at her home, on the road, and at her therapist's offices a woman suffering extreme depression, paranoid symptoms, anxiety toward strangers and a history of repeated suicide attempts. MetLife and its henchmen should appreciate that such conduct may itself precipitate the suicide death of a person who has placed implicit trust in their organization to foster mental health. MetLife should investigate the conduct of Mr. Kooi to insure that its agents are not either wittingly or unwittingly subjecting mentally-ill claimants to untoward risks of suicide death or other preventable injury.

7

vs. personality disorder vs. adjustment disorder vs. normal examination." (A.R. 482.) Mr. Lewandowki did quote Plaintiff as saying, "I just manipulated the system." (A.R. 480.) This "manipulation" referred to "five inpatient hospitalizations some where about 1990." (*Id.*) Lewandoski did not attach any specific importance to the alleged "manipulation," nor did he specifically reference psychiatric hospitalizations occurring in the late 1990s. He did observe that the patient's thought processes were "confused and disorganized . . . and . . . digressive. . . . Unusual ideations include thoughts of paranoia, loose associations, and dissociative thinking as well as derealization and depersonalization." (A.R. 482.) Mr. Lewandowski further concluded:

> The patient's current severe psychiatric condition significantly complicates this clinical case. The patient would be best served by seeking further psychometric stabilization of recovery prior to neurometric testing. After a period of improvement, the patient can be re-examined by neuropsychology.

(A.R. 483.)

Dr. Broadbent (the immediate care physician who treated for the accident) likewise noted "altered mentation, confusion. . . Bizarre thinking patterns, thought patterns. (*Id.* 488.) Dr. Broadbent also expressed concern about patient's driving so he had her transferred by ambulance to Borgess Medical Center for a CAT scan. (A.R. 487.) The resulting CAT scan was normal. (A.R. 490.) Physicians at the Borgess Medical Center also ordered a social work consultation. (A.R. 489.)

On May 10, 2001, Plaintiff suffered a second and more serious automobile accident. According to the medical records, Plaintiff was driving on a rainy day and was "afraid" of "cold air funnels" she reported witnessing. (A.R. 318, 331.) She broke hard due to cars 10 to 15 car lengths ahead of her which were braking, and her car skidded. (A.R. 318.) The skidding caused her car to collide with a motorcyclist (throwing the cyclist from the roadway) and a second motor vehicle,

which seriously damaged the front of her vehicle. (A.R. 319.) She was taken by ambulance to the Emergency Department of Bronson Hospital. (A.R. 319, 326.) She was treated for back and neck pain, but otherwise discharged since x-rays were normal. (A.R. 326-39.) The emergency examination did note Plaintiff's history of severe anxiety and mental illness. (A.R. 326.)

In September 2001, Kathryn Taylor (Plaintiff's therapist and a Licensed Professional Counselor) provided a further rehabilitation plan and a handwritten psychological report to MetLife. The rehabilitation plan included further volunteer work at Sparrows' Haven and stated that Plaintiff spent 6-12 hours per week doing unpaid secretarial, administrative or computer work. (A.R. 274-75.) The report included continued diagnoses of major depression and dissociative identity disorder. (A.R. 277.) Plaintiff's G.A.F. score was 58. (A.R. 78.)

Notwithstanding these apparent practical difficulties associated with Plaintiff's mental illness, the MetLife insurance personnel continued on an apparent long-standing quest to disqualify Plaintiff for disability benefits on the theory that her work with Sparrows' Haven constituted an "occupation or employment" within the meaning of the plan language.[6] Cheryl Edwards (Psychiatric Program Manager and a Licensed Clinical Social Worker) scheduled a meeting with Plaintiff and Kathryn Taylor to discuss the matter on December 17, 2001. (A.R. 271-73.) The meeting disclosed that Plaintiff's work for Sparrows' Haven was uncompensated and essentially as she had described in her earlier letter. (*Id.*) Plaintiff spent much of the meeting in a rocking chair with a blanket and "rocked most of the time." (A.R. 272.) The meeting further described Sparrows' Haven as a joint-

---

[6]The MetLife Diary refers to the case as one subject to "High Liability Review." (A.R. 44.) Even if this reference was intended for some legitimate purpose, the manner and number of the claim department inquiries regarding medical review of this file suggest an intention to obtain documentation to justify denial of benefits which are properly due under the plan language.

venture between Taylor and Plaintiff as to which both had invested capital in hopes of later profits.[7] The "business plan," allegedly developed with the help of Plaintiff, foresaw the creation of a large treatment facility (treating 6,000 persons with 50 employees). (A.R. 272.) The business plan, as described in the record, failed to consider or explain how the company would acquire the additional capital necessary[8] to train and employ that many personnel, nor how the company would overcome the difficulty foreseen by Dr. Silk of obtaining paying clients as to a treatment area in which insurance reimbursement is rare.

Ms. Edwards' notes, however, reflect that she was impressed by Plaintiff's "design" of the Sparrows' Haven Website--a job which took Plaintiff some 60-80 hours of work with the good assistance of computer classes from a local Barnes and Nobles bookstore. (A.R. 271.) However, the web pages in the record (A.R. 246-49) are not professional in character or quality and cannot be judged competent professional work. Further, such web pages, would (in the Court's judgment) be unlikely to attract any significant web-business (even assuming that residential therapy was engaged

---

[7]Roberts properly expressed concern about a "conflict of interest" in having a patient share a partnership arrangement with a therapist. (A.R. 269.) While the Court is of the opinion that Ms. Taylor's therapy has assisted Plaintiff and likely prevented further suicide attempts and hospitalizations, the shared business arrangement with a mentally disturbed patient remains highly questionable as a matter of professional ethics, especially where the object of the business relationship is the operation of a business which is unlikely to ever return invested funds, let alone pay a profit. As such, the Court encourages Plaintiff and Ms. Taylor to either abandon shared business or find another therapist/psychiatrist for Plaintiff who is not encumbered by such shared business relationships. This apparent conflict of interest does give the Court some cause to closely examine Ms. Taylor's conclusions; however, the examination of those conclusions generally supports them, especially since Plaintiff has been determined disabled by several independent physicians/psychologists over a prolonged period of time.

[8]The plan estimated that $200,000 was necessary as start-up capital.

because of web pages).⁹ Edwards' notes reflect that no physician was under contract to provide services at Sparrows' Haven or otherwise affiliated. (A.R. 271.) During the meeting, Plaintiff expressed continued anxiety about performing any form of supervised work and closed the interview in tears. (A.R. 272-73.) Plaintiff also noted that she was no longer able to drive. (A.R. 272.)

During late February 2002, the four-year anniversary of the disability coverage passed. Plaintiff was notified during May 2002 that her claim had been extended during this period and she received continued disability payments. (A.R. 99.)

On May 1, 2002, MetLife requested Ann Tacl (a rehabilitation counselor) to provide a written report concerning Plaintiff's employability. (A.R. 98-99.) As background, Tacl was provided Cheryl Edwards' Report of her December 2001 interview and information about Sparrows' Haven and Plaintiff's efforts on behalf of Sparrows' Haven and its web pages. (*Id.*) The Tacl report, for the most part, completely ignored medical information supporting disability, psychiatric hospitalization records, or the reports of examining psychologists and previous rehabilitation counselors who concluded that Plaintiff was not employable at any occupation nor able to operate a for-profit business. (*Id.*)

Tacl's report is dated May 14, 2002. (A.R. 420.) In it, she concludes that there is "no objective evidence that she [Plaintiff] has cognitive deficits . . . ." (A.R. 422.) This conclusion is wildly inaccurate and wholly ignored the opinions of every psychiatrist or psychologist who has physically examined Plaintiff, including the most recent such examinations. Likewise, her conclusion that Plaintiff was "currently employable on a full-time basis . . .," (A.R. 423), has no

---

⁹Edwards also took notice of Plaintiff's efforts at assisting in the home schooling of a relative. This is unsupervised, non-profit activity. The record as to this activity is also too vague to be helpful in reaching any conclusions as to Plaintiff's abilities to work a job or occupation.

11

support in any examination by any physician, since no physician at any time concluded that Plaintiff was able to work a 20-hour week, let alone a 40-hour week.[10]  Tacl's conclusion that Plaintiff's Sparrows' Haven was a viable business opportunity is likewise sadly mistaken and simply did not consider Dr. Silk's convincing analysis.  Her conclusion that Plaintiff was trying to "manipulate" the system is based upon a rather severe misreading of Lewandowski's report, which misunderstood the time reference, which misunderstood the subject reference, which overlooked Dr. Lasser's prior opinions about Plaintiff's psychiatric "gaming" behaviors, and which is otherwise wholly unfounded in the Lewandowski report itself.  Overall, the Tacl report is explainable only as the product of a professional who has been directed to reach a conclusion, has focused on data only in support of such conclusion, and who has scrupulously ignored all contrary data.[11]

On July 22, 2002, MetLife case manager Jennifer Scott authored a letter denying continued long-term disability benefits effective July 23, 2002 and thereafter.  (A.R. 416-18.)  The letter referenced the file generally but was based primarily upon Cheryl Edwards' interview of December 17, 2001, the conclusion of Ms. Tacl that Plaintiff's non-compensated work for Sparrows' Haven constituted self-employment, and a general conclusion that Plaintiff had not provided sufficient continued documentation of disabling psychiatric illness.  (*Id.*)  This was so even though the letter acknowledged that Sparrows' Haven had treated only a single patient and was not a profitable

---

[10]Dr. Mary Slater, M.D., in a later medical note written on July 26, 2002, stated "she [Plaintiff] should be restricted to no more than 25 hours per week of working." (A.R. 166.) Slater did not give any opinion about Plaintiff's ability to work lesser hours, such that her note is consistent with a view that Plaintiff was not psychologically capable of working even 15 or 20 hours per week.

[11]The Tacl report likewise did not comment on the Labor Market Survey performed by CorVel Corporation in February 2001, which reached the conclusion that Plaintiff could not perform any jobs in the local economy because of her psychiatric limitations. (*See* A.R. 201.)

venture. (*Id.*) The letter quoted the definitions of disability found in the Kellogg long-term disability plan language and did not rely upon language from MetLife's disability insurance policy. (*Id.*) The letter did not rely upon any recent independent medical examination of Plaintiff.

On January 15, 2003, Plaintiff sent a formal and timely letter to MetLife administratively appealing its claim decision. Plaintiff's letter referenced the MetLife policy language rather than the disability plan language referenced in Scott's letter. (A.R. 144-45.) The letter further indicated that Plaintiff had not worked more than 8 hours a week for any week involving the Sparrows' Haven business. (*Id.*) Contemporaneous time records were provided by Ms. Taylor which showed work time by Plaintiff between 1.5 hours/week and 3.0 hours/week for the weeks of December 2, 2002 through December 29, 2002. (A.R. 142-43.) Plaintiff further explained that the claim determination had misunderstood the kind and amount of services she was performing, the extent of her ongoing disability, and the validity of her recent psychological treatment by her therapist. (A.R. 144-45.)

In light of such appeal, MetLife referred the entire file (more than 2,000 pages as noted) for review by Psychiatrist Ernest Gosline, M.D. (A.R. 135-37.) Dr. Gosline did not examine Plaintiff, but did evaluate the extensive file. Dr. Gosline's Physician Consultant Review (three-page report) addressed three specific questions:

> A. . . Does the medical documentation on file support EE's inability to perform her own occupation as an associate director as of 07/22/02?
>
> B. . . . If the answer to . . .A is yes, please advise how the medical supports and explain[s] what her limitations or restrictions would be?
>
> C. . . . If the answer to . . . B is no, please advise what documentation is lacking?

(A.R. 136.) The Review did not definitively answer these questions, since the analysis given on page 3 of the Review assumed an answer of both yes and no to question A. (*See* A.R. 137.) The Review

13

nevertheless did note the history of psychiatric hospitalizations, the extensive diagnoses for dissociative identity disorder and major depression, and G.A.F. scores between 40-55.[12] (A.R. 135.)

As to Question A, Gosline wrote:

> The question of whether this EE has a global impairment of function that would prevent her from employment in a capacity of an associate director for another employer has not been adequately determined by the information provided. There certainly is considerable information provided that she would not be able to return to the original job that she had with Kellogg . . . The medical documentation does not support this person's inability to function at any occupation commensurate with her skills, background and training since she has considerably a high level of education and a high level of transferable skills available.

(A.R. 136-37.) The remainder of this Review recognizes both information supporting disability (past hospitalization, minimal hours recently worked, vulnerability to psychiatric symptoms) and ability to work (alleged work of 20 hours per week and assistance of child/relative in home schooling). (*Id.*)

It ends with the general conclusion that:

> There is no question that there is adequate documentation as to this claimant's psychiatric condition or conditions, but there is a lack of documentation as to what limits these conditions have on her ability to function in any type of work that would utilize her extensive transferable skills. These statements certainly have been verified with the IME report and also the BHU review of January 2002.

(A.R. 137.)

MetLife then issued its determination of March 3, 2003, which reaffirmed its earlier administrative denial. (A.R. 131-33.) MetLife again utilized the disability plan language as opposed to its own policy language. (A.R. 131.) In support of this decision, it cited the examination of Alan Lewandowski of April 24, 2001 (even though benefits were expressly continued after the Lewandowski exam because it was deemed that Plaintiff could not work at that time). It also cited

---

[12]The range selected is reflective of serious symptoms of mental illness and serious impairment of social and occupational functioning.

the Tacl and Gosline reports for the proposition that Plaintiff's disability was not sufficiently documented. (A.R. 132.) It further cited the ability to write and compose the appeal letter as inconsistent with disability.[13] (A.R. 132.)

Brenda Zanny then sent another letter (dated March 13, 2003) regarding the denial of appeal to Anna Marie Monaco (MetLife Procedure Specialist) and again urged that she is disabled under the MetLife policy language[14] (which included a lesser standard for the first 24-months of disability and a two-part standard for long-term disability.) (A.R. 128-29.) Zanny's letter noted that her essentially investment businesses (Sparrows' Haven and the real estate partnership owning the real estate) were generating no money, but she had earned $25 in 2002 selling Amway (Quixtar) products.[15] (A.R. 129-30.)

---

[13] If this is a regular basis for denial by MetLife, then presumably it has a 100 percent formula for denying claims–since then it would deny badly drafted letters as ill-explained and deny good letters as evidence of a lack of disability. Of course, this is preposterous since the insurance company will seldom if ever have a basis in fact for knowing how a well-written letter was prepared (*i.e.,* whether by claimant, attorney, relative, *etc.*) It is noted that Plaintiff regularly had others prepare correspondence on her behalf. (*See, e.g.,* A.R. 414-16.)

[14] Plaintiff and her counsel argue that the policy language controlled–because it applied a slightly more liberal standard as to what constitutes long-term disability. The Court finds such argument unpersuasive because the Plan language clearly dictated the application of its definitions after 36-months for the duration of the disability. It is not either customary or commercially reasonable to displace those definitions with separate policy definitions which were not intended by the commercial transaction. In this case, the commercial intent of the respective parties was for the plan language (including those terms requiring *de novo* review) to control disability coverage both before and after the 60-months-disability anniversary date. The terms of the MetLife policy are, therefore, ineffective except for the general assignment of the risk to MetLife after the 60-month anniversary date. With this said, the record evidence shows that Plaintiff met this definition of long-term disability for all pertinent times after July 22, 2002.

[15] According to the record, "Quixtar" products (produced by the former Amway company) are distributed over the internet, meaning sales occur without in-person client contact.

By letter of September 25, 2003, Monaco acknowledged that its earlier letter had improperly utilized the insurance language rather than the controlling plan language:

> MetLife is aware that you were provided with an erroneous definition of disability in MetLife's letter to you dated December 27, 2002 and that the same definition was contained in a copy of a Certificate of Insurance issued by MetLife that covers you for LTD benefits. We regret that this erroneous information was provided to you, but, as stated, the correct definition of long-term disability under the Plan that covers you is the definition stated in the SPD attached hereto and quoted herein. . . . .

(A.R. 127.) Based on the Plan definition, MetLife reiterated its denial of benefits, based upon its previous rationales including Plaintiff's well-drafted letter of March 13, 2003. (A.R. 126.) No new independent medical examination nor other review was conducted in connection with the September 25, 2003 denial.[16]

This suit was then filed in 2005 timely appealing the denial of disability benefits on July 22, 2005. The Complaint was thereafter amended on March 9, 2006 to assert a claim that Plaintiff is not only entitled to an award of long-term disability payments but also "full benefits" of employment. (*See* Second Am. Compl. ¶ 61.) Defendants also later amended their Affirmative Defenses to assert the defense of settlement and release. (Am. Affirm. Defenses ¶¶ 9-12.) In her briefing in this case, Plaintiff requests awards for various sundry benefits, aside from the disability payments, including continued medical, prescription, dental and pension benefits, and life and accidental death or dismemberment insurance. (*See* Pl.'s Resp. Br. Re Other Benefits 7.) However, the claim for benefits overlooks Brenda Zanny's Settlement and Release of Kellogg Company (the responsible

---

[16]Given MetLife's continued and repeated rejection of its own policy language, the Court deems any reliance on the policy language by it, including both the definition of disability and the standard of review under the policy, as improper since the same have been waived by MetLife. However, even were the Court to apply the policy language, this would not alter the Court's conclusion of disability.

16

party for the "other" benefits). Brenda Zanny received a $53,000 settlement for that release. The only exceptions made in the release were for Plaintiff's claims for long-term disability benefits and a claim for workers' compensation. (Defs.' Ex. V ¶ 2(ii).) The sundry benefits were simply released. (*Id.*) Plaintiff's arguments to the contrary only misconstrues the settlement language which is clear on its face and from the context. As such, Plaintiff's claims for the "other benefits" are barred by release, accord and satisfaction, and her failure to tender back the consideration received. *See Samms v. Quanex Corp.*, 1996 WL 599821, *3 (6th Cir. 1996) (citing *Wittorf v. Shell Oil Co.*, 37 F.3d 1151 (5th Cir. 1994) and *Stefanac v. Cranbrook Educ. Cmty.*, 458 N.W.2d 56 (Mich. 1990)). Those claims will, therefore, be dismissed with prejudice.

## **STANDARDS OF ERISA REVIEW**

Typically, in ERISA cases, the district court will apply an "arbitrary and capricious" standard of review to an ERISA plan administrator/fiduciary's decision regarding benefits since most plans provide the administrator/fiduciary with discretionary authority to determine eligibility for benefits. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109, 115 (1989). However, when a plan does not reserve such discretionary authority to the administrator, the benefit determination is reviewed wholly *de novo*–meaning that the district court takes a "fresh look" at the claim determination without deference to the claim administrator and without reference to any presumption of correctness. *See Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609, 618-19 (6th Cir. 1998) (J. Gilman, concurring); *Perry v. Simplicity Eng'g Div. of Lukens Gen. Indus.*, 900 F.2d 963, 966 (6th Cir. 1990). In this case, discretion has not been reserved and the claim determination is to be reviewed *de novo*.[17]

---

[17]Defendants concur with this standard of review. (*See* Defs.' Mot. to Affirm ¶ 4.) The Court would, however, reverse the Administrator's decision even if an arbitrary and capricious standard were applied in light of the underlying record.

This review is limited to the administrative record. *Wilkins*, 150 F.3d at 618-19. The summary judgment procedures set forth in Federal Rule of Civil Procedure 56 are inapplicable. Rather, the district court is to make an independent review of the administrative record. *Id.* In so doing, the district court does not apply the "treating physician rule" applied to social security determinations. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833-34 (2003).[18] That is, such opinions are not entitled to any special weight by the administrator or reviewing court. *Id.*

**LEGAL ANALYSIS**

This record is an open indictment of MetLife's practices and treatment of the mentally-ill and long-term disability benefits. In this case, MetLife regularly reviewed the client's file with an open intention to deny benefits despite the profound and compelling evidence of serious and prolonged mental illness. MetLife in July 2002 concluded that Plaintiff was no longer disabled without any independent medical examination supporting a conclusion that her condition had improved. MetLife relied solely upon a search-and-destroy mission by Cheryl Edwards, which sought to attribute abilities to Plaintiff even though Edwards had not examined Plaintiff, could not competently make a psychiatric examination of Plaintiff, and did not seek an independent medical examination by a competent psychiatrist. Edwards and Tacl (at Edwards suggestion) then concluded that–even though Plaintiff could not work with any kind of supervisor – Plaintiff could nevertheless engage in the occupation of a business entrepreneur (meaning the owner/operator of Sparrows' Haven), even though the occupation of a business proprietor (to the extent that it involves actual work as opposed

---

[18] Defendants have argued in connection with the *Nord* decision that the social security finding is not binding due to the different legal standards involved; this is true, but it still leaves Defendants otherwise fishing for a factual basis to justify a denial of benefits which is not factually supported on this record.

to passive investment) generally requires work exceeding 40 hours per week and even though there was no reliable record supporting that Plaintiff could work even 20 hours per week.

This conclusion regarding Sparrows' Haven takes a place in the Hall of Fame of Bad Ideas. What this conclusion neglects, among other things, is that Sparrows' Haven, though in name a business, is better characterized as a pipe-dream[19] since it stands no chance at ever generating operating profits. The reference to Plaintiff's role as a "director," "manager" or "executive" of Sparrows' Haven is about as important as any person's self-ordained role as special emissary to either Santa Claus or the Tooth Fairy. While this pipe-dream itself may be effective as a mental health technique, in the same way that sheltered work may be effective as a rehabilitation technique, it has no business being confused with active capable employment in any real market. Regardless of Plaintiff's self-aggrandizing characterizations of her role and station (which themselves connote mental illness), the most reasonable objective construction of Plaintiff's activities on behalf of Sparrows' Haven are minimal voluntary activities of a passive investor seeking profit in a hopeless investment. Income from passive investments is consistent with disability since it does not reflect upon one's ability to engage in active work.[20] *See Prai v. Mass. Mut. Life Ins. Co.*, 2006 WL 1382322, at *3-4 (W.D. Mo. 2006) (holding that managing one's income from passive investments and doing charitable work does not fit within the definition of an "occupation"). The last report of Dr. Gosline, which is better characterized as a "punt" rather than a specific record review, is wholly consistent with the conclusion that Plaintiff's long-term psychiatric disabilities have not changed.

---

[19]*See* Eugene O'Neill, *The Iceman Cometh* (Vintage Int'l. 1999 ed.).

[20]Even folks on respirators profit from passive investments, which, of course, does not denote an ability to perform an occupation or employment by them.

The independent medical examinations which had determined prolonged disability over time and the record of psychiatric hospitalization and of functional disability is not refuted by the devout wishes of MetLife's case managers.

Accordingly, this matter will be remanded to the Administrator for payment of all long-term disability benefits (excluding medical insurance, dental, *etc.*) which have accrued since July 22, 2002 to the date of reimbursement. After the date of initial reimbursement, further payment of disability benefits are subject to the terms of the controlling plan language, including such further medical review as MetLife may reasonably require (though, of course, those latter determinations are likewise subject to further appeal and challenge by Plaintiff).

Plaintiff's requests for payment of "other benefits" will be denied and dismissed with prejudice. The issue of attorney fees is reserved. Should Plaintiff seek an award of attorney fees, Plaintiff shall file a motion for attorney fees within 30 days of the entry of Judgment.

## **CONCLUSION**

Judgment shall enter in Plaintiff's favor remanding to the Administrator for an award of long-term disability benefits.

Other claims for employee benefits will be denied with prejudice.

DATED in Kalamazoo, MI:  
    June 30, 2006

    /s/ Richard Alan Enslen  
RICHARD ALAN ENSLEN  
SENIOR UNITED STATES DISTRICT JUDGE